IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>$968,955.00 IN UNITED STATES CURRENCY,<br><br>　　　　Defendant. | Case No. 20-CV-1351-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Suppress Evidence filed by Claimant Hsu Chi Suen in this civil forfeiture matter. (Doc. 22). Suen seeks to suppress evidence of the $968,955.00 seized by Plaintiff United States of America after the stop and search of a black Volkswagen in which he was a passenger. (Doc. 1). For the reasons set forth below, the Motion to Suppress Evidence is denied.

### BACKGROUND

On July 3, 2020, Drug Enforcement Administration Task Force Officers ("TFOs") Larry Brantley and Kyle Waddington were sitting in their patrol car on Interstate 70 in Madison County, Illinois, as part of the DEA's Operation Trojan Horse. (Doc. 22 at p. 4). The purpose of Operation Trojan Horse is to seize narcotics. (*Id.* at ¶ 5). The TFOs observed a black Volkswagen with California plates and began following it. (*Id.* at ¶¶ 6-7; Doc. 1-1 at ¶ 1). The vehicle was traveling within the speed limit, it was not swerving or driving erratically, and there was no damage to the vehicle. (*Id.* at ¶ 8). The officers

noticed, however, that two face masks were hanging from the rearview mirror, obstructing the driver's view of the windshield. (Doc. 1-1 at ¶1). The officers, therefore, initiated a traffic stop.

TFO Waddington informed the driver of the reason for the traffic stop, and the driver produced a New York license identifying herself as Yuzhu Liu. (*Id.* at ¶ 2). The passenger, Hsu Chi Suen, told TFO Waddington that he and Liu were traveling to Oklahoma City to visit a friend for a day or two and that they might stop in St. Louis, Missouri, to see the Gateway Arch on the way back to New York. TFO Waddington thought Suen was acting nervous; he was stretching in his seat and laughing loudly at unusual times. (*Id.* at ¶ 3).

At the same time, TFO Brantley spoke with Liu near the patrol vehicle. (*Id.* at ¶ 2). Liu said she and Suen were traveling to Oklahoma City from New York to visit with friends and that they rented the vehicle in Indianapolis after experiencing trouble with Liu's personal vehicle. (*Id.* at ¶ 4). Liu said the car needed to be returned "the day after tomorrow." (*Id.*). Liu also said that Suen was her boyfriend. (*Id.*). When TFO Waddington returned to the patrol car with Suen's information, TFO Brantley told Liu she could return to her vehicle until the traffic stop was concluded. (*Id.*).

The vehicle's rental agreement showed that it was rented by Liu in Indianapolis on July 3, 2020, and had a return date of July 6, 2020. (*Id.*). While the TFOs spoke about the traffic stop, they observed Liu moving around erratically in the car while Suen was turned around staring back at them. (*Id.* at ¶ 5). The TFOs believed Liu and Suen's odd behavior combined with their strange travel plans were signs of criminal behavior, and

they decided to ask for consent to search the trunk of the vehicle. (*Id.*).

TFO Waddington returned to the passenger side of the vehicle, handed Liu and Suen their driver's licenses, and told them they were "free to go." (*Id.* at ¶ 6). He then informed Liu and Suen that the area was a major drug corridor, giving examples of drugs like marijuana, cocaine, and heroin. (*Id.*) When asked if any of those drugs were in the vehicle with them, Liu and Suen laughed loudly while saying "no, no, no." (*Id.*). TFO Waddington then asked Liu and Suen if they would pop the trunk so the TFOs could make sure, to which they both shook their heads forward and said yes. (*Id.*).

Inside the trunk, the TFOs found a large blue suitcase and noted it was very heavy for such a short trip. (*Id.* at ¶ 7). As they began unzipping the suitcase, Suen got out of the car and said, "That's our life savings." (*Id.*). Inside the suitcase was a large amount of cash, most of which was rubber-banded into smaller bundles, although some was vacuum-sealed. (*Id.*).

TFO Waddington arrested Suen, read him his *Miranda* rights, and asked if he was willing to speak to them without a lawyer present. (*Id.* at ¶¶ 8-9). Suen nodded his head and said "yes." (*Id.* at ¶ 9). TFO Waddington did the same with Liu, who also agreed to speak with the officers without a lawyer present. (*Id.*).

TFO Waddington drove the rental vehicle to the Pontoon Beach Police Department (PBPD) with Liu in the front passenger seat. (*Id.* at ¶ 10). TFO Waddington told Liu that they found a large amount of money inside a suitcase and asked if she knew anything about it. (*Id.*). Liu said she did not know anything about the money. (*Id.*). Liu stated that

when she asked Suen why he had such a large suitcase for a short trip, Suen told her it was equipment for his friend in Oklahoma City. (*Id.* at ¶ 12).

TFO Brantley drove to the PBPD with Suen in the front passenger seat of his patrol vehicle. (*Id.*). On the way there, Suen told TFO Brantley the money was his life savings, that his travel business makes about two million dollars per year, and that it is traditional in Asian culture to save money at home. (*Id.* at ¶ 11). He also told TFO Brantley that there were opportunities in Oklahoma for Asian restaurants and that he was also thinking about buying a marijuana farm. (*Id.*). Suen explained he had $970,000 because it is impossible to get a bank to finance a marijuana investment. (*Id.*). The money was vacuum sealed, he said, to make it easier to carry. (*Id.*).

Before arriving at the station, Suen told TFO Brantley that about $600,000 of the money inside the suitcase was his own, while the remainder of the money belonged to three investor friends. (*Id.*). Suen's portion of the money came from the $100,000 salary he paid himself from his business. (*Id.*). His wife (not Liu) also made about $100,000 as an engineer. (*Id.*). TFO Brantley observed that Suen appeared nervous and was sweating heavily. (*Id.*). He also said multiple times that he needed a good attorney. (*Id.*).

After arriving at the PBPD, DEA Special Agents Callon Andrews and Winfred Strickland separately interviewed Liu and Suen. (*Id.* at ¶ 15). Suen stated that all of the seized currency was his except about $30,000, which belonged to friends. (*Id.*). He said none of the seized currency belonged to Liu. (*Id.*). He later changed his story and said $300,000 was contributed by friends. (*Id.*).

On July 6, 2020, Task Force Officer Gregory Degener and his K9 partner, Blu, conducted a sniff of the seized currency. (*Id.* at ¶ 24). Five paper bags were arranged in the lobby of the DEA's office. (*Id.*). One contained the seized currency, while the others contained new copy paper. (*Id.*). K9 Blu gave a positive alert to the presence of narcotic odors on the bag containing the seized currency. (*Id.*).

On December 18, 2020, the Government initiated this civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6) alleging the $968,955 was furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801, *et seq.* (Doc. 1). Suen filed a verified claim asserting he has a legitimate possessory interest in the seized currency (Doc. 8), and he now moves to suppress evidence of the funds (Doc. 22).

## LEGAL STANDARDS

### A. Civil Forfeiture

Under 21 U.S.C. § 881(a)(6), all money furnished or intended to be furnished by a person in exchange for a controlled substance, and all proceeds traceable to such an exchange, are subject to forfeiture to the United States. Civil forfeiture is a proceeding *in rem*, where the property itself is treated as being guilty of the wrongdoing. *United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018). The property owner's culpability is not considered in determining whether the property should be forfeited. *United States v. $128,915.00*, No. 20-CV-00667-JPG, 2021 WL 2432064, at *2 (S.D. Ill. June 15, 2021). Thus, even when there is no criminal prosecution, the Government can seize cash that it

believes is traceable to drug trafficking. *See* 21 U.S.C. § 881(a)(6); 18 U.S.C. § 983(a)(3)(B). The government bears the burden of establishing, by a preponderance of the evidence, that the property is subject to forfeiture. *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005) (citing 18 U.S.C. § 983(c)(1)).

"A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Rule G(5)(a)(i). The claimant may then move to suppress the seized property under the Fourth Amendment's exclusionary rule. *United States v. $128,915.00*, No. 20-CV-00667-JPG, 2021 WL 2432064, at *2 (S.D. Ill. June 15, 2021) (citing Rule G(8)(a)). While there has been some debate as to whether the exclusionary rule should apply in civil forfeiture proceedings, district courts presented with motions to suppress in civil forfeiture actions typically resolve the merits of the claimant's Fourth Amendment challenge. *See United States v. Marrocco*, 578 F.3d 627, 642–43 (7th Cir. 2009) (Easterbrook, J., dissenting) (expressing doubt that the exclusionary rule applies to civil asset forfeitures); *but see United States v. $9,171.00 United States Currency*, No. 116CV00483TWPMJD, 2020 WL 9037091, at *2 (S.D. Ind. Mar. 18, 2020); *United States v. $96,480.00 in United States Currency*, No. 15-CV-0573-MJR-RJD, 2017 WL 1021292, at *5 (S.D. Ill. Mar. 16, 2017).

### B. The Fourth Amendment

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. In order to "compel respect for the constitutional guaranty," the Supreme Court of the United States created

the exclusionary rule. *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). When applicable, the exclusionary rule forbids the use of evidence obtained by police officers in violation of the Fourth Amendment. *Davis*, 564 U.S. at 231–32.

"As a general matter, the 'seizure of personal property is per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.'" *United States v. Funds in the Amount of $830,000 in United States Currency*, No. 18 C 01537, 2019 WL 95169, at *3 (N.D. Ill. Jan. 3, 2019) (quoting *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010)). Nevertheless, a warrantless search is permissible if an authorized person voluntarily consents to the search. *Id.*

As relevant here, the Fourth Amendment protects "personal rights" that "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). To challenge evidence obtained from an unlawful search, a person must show a "legitimate expectation of privacy" in the area searched. *Id.* at 143, 149. Passengers in cars stopped by police lack a legitimate expectation of privacy unless they can show some possessory interest in the searched vehicle. *See United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015). Passengers may, however, challenge the legality of a traffic stop itself. *See id.* If the stop is deemed unlawful, the passenger then has standing to move to suppress evidence derived from the illegal stop. *Brendlin v. California*, 551 U.S. 249, 255–59 (2007). Where the stop is lawful, however, the passenger lacks standing to challenge such evidence. *See Wilbourn*, 799 F.3d at 908.

### DISCUSSION

As a preliminary matter, Suen does not dispute the material facts as they have been presented to the Court. Thus, the Court may rule on the motion without a hearing. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion."); *United States v. $9,171.00 United States Currency*, No. 116CV00483TWPMJD, 2020 WL 9037091, at *2 (S.D. Ind. Mar. 18, 2020).

Suen alleges that his Fourth Amendment rights were violated during the warrantless search of the rental vehicle. Thus, the $968,955.00 in U.S. Currency must be suppressed as the fruit of unlawful search. Specifically, Suen argues: (1) the stop of the vehicle was illegal; (2) even if the initial stop was justified, the ensuing search of the vehicle was unlawful; and (3) the prolonged seizure of the vehicle and subsequent search were unlawful.

**A. Traffic Stop**

Suen first argues the traffic stop was unlawful and thus the fruits of the stop, including all physical evidence recovered, all observations of the responding officers, and any statements made by Suen to law enforcement should be suppressed.

"The Supreme Court has held that the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred." *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). Probable cause exists when "the circumstances confronting a police

officer support the reasonable belief that a driver has committed even a minor traffic offense." *Id.* (quoting *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000)). Moreover, "[a] stop and search can be reasonable even if the defendant did not actually commit an offense as long as the officer reasonably believed an offense occurred." *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006). When a police officer mistakenly believes that the law prohibits something that is actually legal, however, even a good faith belief that the law has been violated will not support the stop. *Id.* (citing *United States v. McDonald*, 453 F.3d 958, 961–62 (7th Cir. 2006)).

The standard for determining whether probable cause existed is an objective one. *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). The Court must first assess the officer's actions in light of the facts and circumstances known to the officer at the time of the stop. *Id.* (citing *Scott v. United States*, 436 U.S. 128, 137 (1978)). Second, the court must decide whether a reasonable officer could conclude that these facts amount to a violation of the law. *Id.*; *United States v. Jackson*, 962 F.3d 353, 358 (7th Cir. 2020).

Under Illinois law, "No person shall drive a motor vehicle with any objects placed or suspended between the driver and the front windshield . . . which materially obstructs the driver's view." 625 ILL. COMP. STAT. 5/12-503(c). In deciding what objects constitute "material obstructions," Illinois courts have held that "size alone does not determine whether an object materially obstructs the driver's view." *Garcia-Garcia*, 633 F.3d at 615 (citing *People v. Mott*, 906 N.E.2d 159, 164-65 (Ill. App. Ct. 2009). In *Mott*, the Illinois Court of Appeals noted air fresheners, necklaces, pendants, parking passes, charms, beads, crucifixes, medals, and sunglasses could all potentially constitute material obstructions

when suspended from a rearview mirror. *Mott*, 906 N.E.2d at 165-66; *but see People v. Cole*, 874 N.E.2d 81 (Ill. App. Ct. 2007) (no reasonable officer would conclude a short strand of opaque beads hanging from the rearview mirror, one-quarter inch in diameter, would materially obstruct the driver's view); *People v. Johnson*, 893 N.E.2d 275, 277 (Ill. App. Ct. 2008) (an air freshener shaped like a life-size pair of cherries suspended from a rigid wire would not reasonably obstruct the driver's view even if placed at eye level).

In *Garcia-Garcia*, an officer pulled over a vehicle after seeing a tree-shaped air freshener, approximately five inches by three inches, hanging from the rearview mirror. 633 F.3d at 615. The defendant subsequently moved to suppress evidence procured from the stop. *Id.* The Seventh Circuit concluded that objects "may (or may not) constitute material obstructions depending on their size, their position relative to the driver's line of vision, and whether they are stationary or mobile." *Id.* In that case, the air freshener's size, when combined with its position relative to the driver, could allow a reasonable officer to conclude that it violated Illinois's prohibition on material obstructions. *Id.*

Here, at the time of the stop, there is no dispute that there were two face masks[1] hanging side-by-side from the rearview mirror of the Volkswagen. The Government incorporated photographic evidence of the masks into its briefing, which shows the masks were approximately six inches by seven inches and were hanging freely from the rearview mirror. The masks were clearly visible to the officers as they drove behind the vehicle. Furthermore, TFO Waddington submitted an affidavit in which he states that he

---

[1] The stop occurred on July 6, 2020, during the first wave of the Covid-19 pandemic.

and TFO Brantley initiated the stop "for displaying an obstructed view of windshield." (Doc. 1-1). The fact that the masks were in the center of the windshield—and not directly in front of the driver, as Suen argues—is irrelevant to whether the masks were obstructing the driver's view. Drivers need a clear view of the entire windshield, not just the portion directly in front of their face, and the masks certainly could have materially obstructed Liu's view to her right.

Like the air freshener in *Garcia-Garcia*, the Court finds that a reasonable officer could conclude that the face masks constituted a material obstruction of the driver's view. Therefore, the officers had probable cause to believe a traffic violation had occurred under Illinois law and the stop, itself, was not unlawful.

### B. Vehicle Search

Suen next argues that, even if the stop was lawful, the subsequent search of the Volkswagen violated the Fourth Amendment. As a passenger, however, Suen lacks standing to challenge the legality of the search unless he can show some possessory interest in the vehicle. *See Wilbourn*, 799 F.3d at 908 (without a possessory interest in the vehicle, passengers in cars stopped by police lack a legitimate expectation of privacy). With regard to rental vehicles, the Seventh Circuit has held that a person listed on a rental agreement as an authorized driver has an objective expectation of privacy in the vehicle and may challenge a search of the rental vehicle. *United States v. Walton*, 763 F.3d 655, 661 (7th Cir. 2014). Here, the car was rented by Liu, and there is no evidence that Suen was listed as an authorized driver. (Doc. 1-1 at ¶ 4). Accordingly, he had no expectation of privacy in the vehicle, and he lacks standing to challenge the legality of the search.

C. **Prolonged Seizure of the Vehicle and Subsequent Search**

Even if Suen lacks standing to challenge the search of the vehicle, he still maintains standing to challenge the seizure of his person and the resulting search if that seizure was unlawful. *United States v. Sanford*, 806 F.3d 954, 958–59 (7th Cir. 2015).

A detention following a traffic stop, like any seizure, must satisfy the Fourth Amendment's requirement of reasonableness. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1420 (2022) ("Time and again, the Supreme Court has held that 'the ultimate touchstone of the Fourth Amendment is reasonableness.'"). Even a proper traffic stop can run afoul of the Fourth Amendment if the manner of executing the seizure unreasonably infringes interests protected by the Constitution. *United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005); *Caballes*, 543 U.S. at 407. "Traffic stops must remain limited in scope: A seizure for a traffic violation justifies a police investigation of that violation." *Cole*, 21 F.4th at 427-28 (citation omitted). Police cannot "detour" from the mission of the traffic stop to investigate other criminal activity unless the officer "has reasonable suspicion of other criminal activity to independently justify prolonging the stop." *Id.* at 428.

Suen argues that the traffic stop and resulting seizure was unlawful because it was prolonged beyond the time reasonably required to complete the warning. Suen and Liu had been questioned, they gave similar stories regarding their travel, and Liu was allowed to return to the vehicle. TFO Waddington then issued a warning and told Suen and Liu they were free to go—before continuing his interrogation and asking for consent to search. The officer then searched the trunk of the vehicle and found the suitcase

containing the seized currency. Suen asserts this seizure was prolonged in violation of the Fourth Amendment, the subsequent search was illegal, and the seized evidence must be suppressed.

In response, the Government asserts that Suen and Liu were seated in the vehicle, were handed the rental agreement and their driver's licenses, and were told they were free to go. At this point, the seizure of the vehicle and its passengers for purposes of the traffic stop was terminated. Suen and Liu "could have simply expressed their desire to leave, turned on their blinker, and put the car in drive." (Doc. 23, p. 10). Instead, Suen and Liu voluntarily answered the questions posed by TFO Waddington. Moreover, the entire traffic stop took roughly nine minutes from the beginning to the end of the detention. Even if Suen and Liu did not think they were free to go, the Government argues, the detention was supported by probable cause and, thus, the officers were entitled to ask further crime-detecting questions as long as they pose only a minor inconvenience.

The Seventh Circuit's decision in *United States v. McBride* is instructive. *United States v. McBride*, 635 F.3d 879 (7th Cir. 2011). There, an officer initiated a traffic stop on a speeding car with no license plate. *Id.* at 880. The officer noticed that the driver, McBride, and his passenger were visibly nervous and avoiding eye contact. *Id.* at 881. Both occupants were questioned separately, and they gave differing stories on their travel plans. *Id.* The officer eventually handed McBride a speeding ticket and explained his payment responsibilities. *Id.* Before they left, however, the officer asked if McBride had "any dead bodies or anything" in his car. *Id.* McBride laughed and said, "No, would you

like to search?" *Id.* The officer said he would like to search and asked for consent to do so, which McBride provided. *Id.* The search revealed a gun and a can containing crack cocaine and marijuana. *Id.*

On appeal, McBride made the same argument that Suen makes here: by the time he consented to the vehicle search, the stop had already been unreasonably drawn out with questions unrelated to the purpose of the traffic violations. *Id.* at 882. The Seventh Circuit disagreed, stating that "[b]ecause a stop based on probable cause will also justify a custodial arrest, a driver detained during such a stop has no right to expeditious release. . . . Further questioning is permitted and will not render the stop unreasonable so long as the officer asks '[q]uestions that hold potential for detecting crime, yet create little or no inconvenience.'" *Id.* (quoting *United States v. Childs*, 277 F.3d 947, 952, 954 (7th Cir. 2002)). Thus, the officer had "a grace period" after the stop concluded to ask investigatory questions, provided they did not cause "inconvenience." *Id.*

Here, TFOs similarly had probable cause to stop the vehicle for a traffic offense. Thus, they were permitted to ask additional questions meant to detect further criminal activity, as long as they did not cause inconvenience. Given that the entire stop lasted only nine minutes, the Court finds that TFO Waddington's additional questions about drugs in the vehicle did not cause any inconvenience.

Additionally, TFO Waddington had reasonable suspicion of other criminal activity, "independent of the traffic violations, to believe that his questions held the potential for detecting crime." *Id.* "Reasonable suspicion exists when, considering the totality of the circumstances, an officer has a particularized and objective basis for

suspecting the particular person stopped of criminal activity." *Cole*, 21 F.4th at 433 (quotation omitted). The standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

TFO Waddington developed a reasonable suspicion of other criminal activity when he observed Suen's nervous behavior, including stretching in his seat, laughing loudly at unusual times, and staring back at the officers, and when he considered Suen's odd travel plans. TFO Waddington also testified in his deposition that he knew, through training and experience, that there was a large group of individuals in the Asian-American community who were involved in investing in illegal marijuana farms and marijuana in Oklahoma. This knowledge raised TFO Waddington's suspicions once Suen mentioned that Oklahoma City was their destination.

Thus, TFO Waddington was justified in "briefly extending the stop to investigate the suspicion." *McBride*, 635 F.3d. at 882; *see also Cole*, 21 F.4th at 434 (totality of circumstances including extreme nervousness, dubious travel plans, a newly registered and insured vehicle, and inconsistent statements supported belief that defendant was engaged in criminal activity); *United States v. Figueroa-Espana,* 511 F.3d 696, 703 (7th Cir. 2007) (extended stop justified by driver's nervous demeanor and conflicting statements); *United States v. Martin,* 422 F.3d 597, 602 (7th Cir. 2005) (driver aroused reasonable suspicion with inconsistent statements to officer).

For these reasons, the Court finds that the officers did not unlawfully prolong the

traffic stop, the seizure of Suen's person was lawful, and the search of the vehicle did not violate the Fourth Amendment.

## Conclusion

For the reasons set forth above, the Motion to Suppress Evidence filed by Claimant Hsu Chi Suen (Doc. 22) is **DENIED**.

**IT IS SO ORDERED.**

**DATED:** May 20, 2022

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**